UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| SONIA PEREZ, individually, and on behalf of all others similarly situated, | |
| Plaintiff, | Case No. 23-cv-3837 |
| v. | |
| GALE HEALTHCARE SOLUTIONS, LLC, | **JURY TRIAL DEMANDED** |
| Defendant. | |

## CLASS ACTION COMPLAINT

Plaintiff Sonia Perez ("Plaintiff Perez"), individually, and on behalf of all others similarly situated, brings this action against Gale Healthcare Solutions, LLC ("Gale Healthcare" or "Defendant"), by and through her attorneys, and alleges, based upon personal knowledge as to her own actions, and based upon information and belief as to all other matters, as follows:

### Nature of the Action

1. This civil action is brought by the above-named Plaintiff, who brings this class action arising from Defendant's unlawful maintenance of a mandatory payroll card program that subjects its employees to loading fees, transfer fees, and ATM/withdrawal fees in violation of the Illinois Wage Payment and Collection Act ("IWPCA"), 820 ILCS 115/1, *et seq*.

### Parties

2. Defendant Gale Healthcare is a limited liability company organized under the laws of the State of Florida with its principal place of business at 3101 W. Dr. Martin Luther King Jr. Blvd. #200, Tampa, Florida.

3. Plaintiff Sonia Perez ("Plaintiff Perez") is a citizen of Illinois, residing in Lake County, Illinois.

1

4. Defendant employed Plaintiff Perez as a Registered Nurse from approximately early 2019 until May 15, 2021.

5. At all times relevant to this action, Plaintiff Perez was employed by Defendant in the state of Illinois.

6. At all material times hereto, Gale Healthcare was Plaintiff Perez's "employer" as defined in the IWPCA, 820 ILCS § 115/2.

7. At all material times hereto, Plaintiff Perez was an "employee" of Gale Healthcare" within the meaning of the IWPCA, 820 ILCS §115/2.

## Jurisdiction and Venue

8. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a), because this is a class action in which the amount in controversy exceeds the sum of $75,000, and Plaintiff and all members of the putative Class are citizens of a state different from Defendant.

9. This Court has personal jurisdiction over Defendant because Defendant is authorized to and regularly conducts business in Illinois, and because the acts complained of herein occurred within the State of Illinois.

10. Venue is proper in this Judicial District under 28 U.S.C § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiff's and Class members' claims arose in this District.

## Factual Background

A.  **Defendant Gale Healthcare Solutions**

11. Defendant Gale Healthcare Solutions operates a nationwide staffing company that provides healthcare staffing solutions to healthcare facilities, including long term care facilities,

assisted living facilities, and supportive living facilities, among others, through the use of a mobile device application (the "Gale App").

12. Through the Gale App, Defendant connects its employees—clinicians, nurses and other health services professionals—with healthcare facilities looking to fulfill both near- and long-term staffing needs.

13. Founded in 2016, Defendant's business has grown considerably in the intervening years. Defendant currently employs more than 60,000 clinicians nationwide, including in Illinois, and has expanded so rapidly that it recently secured $60 million in private equity funding.[1]

14. To apply for employment with Defendant and later obtain staffing assignments and manage their employment information, Plaintiff Perez and other current and former employees (the "Class") were required to create an account for the Gale App.

15. Once registered, Class members obtain staffing assignments by simply entering their daily availability into the Gale App. The Gale App then identifies available short- and long-term assignments that align with Class members' schedules, and Class members select their preferred assignment.

16. Upon arriving at their assignment, Class members use the Gale App to clock in for their shift. Upon completing a shift, Class members sign a paper timesheet to clock out, then submit the timesheet directly to Defendant either via email or through the Gale App.

17. Unlike most employers, Defendant does not pay its employees weekly, bi-weekly or monthly. Defendant instead pays Class members for each shift they complete by depositing a shift's wages directly to a payroll card within 24 hours of the shift being completed.

---

[1] *Gale Healthcare Solutions Secures $60 Million Growth Equity Investment from FTV Capital to Remedy National Nursing Shortage*, GALE HEALTHCARE SOLUTIONS, https://galehealthcaresolutions.com/gale-healthcare-solutions-secures-60-million-growth-equity-investment-from-ftv-capital-to-remedy-national-nursing-shortage/ (last visited June 15, 2023).

**B.     Payroll Cards Exploit Workers by Shifting the Burden of Payroll Costs from Employers to Employees**

18.     Payroll cards are one method that employers utilize to pay employees, whereby an employee's pay is loaded to a prepaid, reloadable card each pay period.[2]

19.     Payroll cards function in the same manner as a debit card: a financial institution holds the deposited money in an individual account, and the payroll card provides access to the money much like a debit card.[3]

20.     In 2012, nearly 4.5 million U.S. workers received their wages (totaling $34 billion) on a payroll card, a number that has only increased in subsequent years.[4]

21.     Payroll cards can be a more efficient and cost-effective alternative to more traditional payroll methods for employers, given payroll cards typically cost less per employee to implement and allow for faster payroll processing periods.[5]

22.     While employers claim that payroll cards can also be a convenient option for unbanked employees, payroll cards tend to be accompanied by additional fees not otherwise incurred by employees through traditional payroll methods like paper checks or direct deposit,

---

[2] *See* Lisa Nagele-Piazza, *Thinking About Using Payroll Debit Cards? Read This First*, SHRM (Feb. 7, 2018), https://www.shrm.org/resourcesandtools/legal-and-compliance/state-and-local-updates/pages/employers-payroll-debit-cards-.aspx

[3] *See* Julie Thompson, *The Pros and Cons of a Payroll Card*, BUSINESS.COM (Mar. 22, 2023) https://www.business.com/articles/payroll-card-pros-cons/

[4] Herb Weisbaum, *Employers can't force debit cards on their workers*, CNBC (Oct. 2, 2013) https://www.cnbc.com/2013/10/01/employers-cant-force-debit-card-on-its-workers.html

[5] *See* Julie Thompson, *The Pros and Cons of a Payroll Card*, BUSINESS.COM (Mar. 22, 2023) https://www.business.com/articles/payroll-card-pros-cons/

including charges for ATM withdrawals, balance inquiries, fund transfers, monthly maintenance, and account closures.[6]

23. The payroll card market also is unregulated and, therefore, ripe for abuse.[7] For example, while the Federal Reserve has banned inactivity fees that penalize customers for infrequently using their debit or credit cards, no such protections exist for payroll cards, leading more than two dozen major retailers to have inactivity fees of $7 or more.[8]

24. Indeed, the biggest criticism of payroll cards is that they pass along the associated costs of payroll processing to employees—who are typically hourly, low-wage earning workers—through the various fees associated with the cards.[9]

25. To combat this issue, more than half of the states, including Illinois, have enacted laws regarding payroll cards, which require that, among other protections, employers provide employees who receive their pay through payroll cards a method by which they are able to obtain their wages at no cost, in addition to requirements regarding the provision of certain notices and disclosures about the payroll cards.[10] *See, e.g.*, 820 ILCS § 115/14.5. Many of these statues also preclude employers from making receipt of wages by payroll card a condition of employment. *See, e.g., id.* at § 115/14.5(1).

---

[6] Jessica Silver-Greenberg and Stephanie Clifford, *Paid via Card, Workers Feel Sting of Fees*, THE NEW YORK TIMES (June 30, 2013), https://www.nytimes.com/2013/07/01/business/as-pay-cards-replace-paychecks-bank-fees-hurt-workers.html

[7] *Id.*

[8] *Id.*

[9] *See* Lisa Nagele-Piazza, *Thinking About Using Payroll Debit Cards? Read This First*, SHRM (Feb. 7, 2018), https://www.shrm.org/resourcesandtools/legal-and-compliance/state-and-local-updates/pages/employers-payroll-debit-cards-.aspx

[10] *Id.*

26. Many states, including Illinois, likewise prohibit employers from imposing on employees certain categories of fees associated with its payroll card program, including fees for point of sale transactions, the application, initiation, loading of wages by the employer, or participation in the payroll card program generally. *See, e.g.*, 820 ILCS § 115/14.5(4).

27. Because of these limitations, and following complaints from employees, the Consumer Financial Protection Bureau also published a bulletin warning employers that mandating payroll card use is unlawful under federal law.[11]

28. Still, employees report that, at companies where there is a choice between more traditional payroll methods and payroll cards, it is often more in theory than in practice, and employees are often automatically enrolled in payroll card programs upon hire.[12]

29. Defendant is among those employers who have failed to take heed of both the Consumer Financial Protection Bureau and state law and continues to unlawfully mandate that its employees receive their pay through payroll cards that leave them swimming in unlawful fees, and without first providing them with the required disclosures or securing their voluntary written or electronic consent.

C. **Defendant's Unlawful Use of Employee Payroll Cards**

30. Rather than pay its employees through traditional methods, like direct deposit or paper check, Defendant requires its employees to enroll in its payroll card program upon hire.

---

[11] CFPB Bulletin Warns Employers Against Exclusive Use of Payroll Cards, CONSUMER FINANCIAL PROTECTION BUREAU (Sept. 12, 2013), https://www.consumerfinance.gov/about-us/newsroom/cfpb-bulletin-warns-employers-against-exclusive-use-of-payroll-cards/

[12] Jessica Silver-Greenberg and Stephanie Clifford, *Paid via Card, Workers Feel Sting of Fees*, THE NEW YORK TIMES (June 30, 2013), https://www.nytimes.com/2013/07/01/business/as-pay-cards-replace-paychecks-bank-fees-hurt-workers.html

31. When Defendant hires an employee, it establishes a Money Network account for that employee and issues them a Money Network payroll card, through which Defendant deposits the employee's wages.

32. When an employee completes a single shift at a healthcare facility where he or she was staffed by Defendant, Defendant deposits all wages earned that shift onto the employee's Money Network payroll card within twenty-four hours.

33. Defendant's payroll practices violate the Illinois Wage Payment and Collection Act in a variety of respects.

34. Defendant's employees are required, as a condition of employment, to receive their earned wages through the Money Network payroll cards issued by Defendant. On information and belief, only recently did Defendant extend to its employees the option of receiving their wages via a direct deposit to their financial institution of choice, and then only if Defendant staffed the employee at a long-term assignment (*i.e.*, three months or longer).

35. Defendant also fails to provide its employees with a written disclosure notifying them that payment of wages by payroll card is voluntary and disclosing the terms and conditions of the payroll card program, including:

(a) An itemized list of all fees that may be deducted from their payroll card accounts by Defendant or by the third-party payroll card issuer, Money Network;

(b) A notice that third-parties may assess transaction fees in addition to the fees assessed by Money Network; and

(c) An explanation of how they may obtain, at no cost, their net wages, check their account balances, and request to receive paper or electronic transaction histories.

36. Defendant also fails to provide its employees with a written disclosure notifying them of other method(s) of payment offered, because Defendant effectively fails to offer its employees an alternative, cost-free means by which to receive their wages.

7

37. Most troubling of all, Defendant imposes a variety of payroll card fees explicitly prohibited by Illinois law.

38. First, Defendant uniformly deducts $2 from its employees' wages each time it loads their wages onto their payroll card.

39. Although Plaintiff's and Class members' paystubs identify the deduction as a "Check Fee" or "Instant Pay," the fee undoubtedly is a loading fee since wages are loaded directly to the employees' payroll cards as noted on the paystubs.

40. The loading fees impose a significant financial burden on Class members because of the frequency with which they are incurred: since Defendant pays its employees their per-shift wages within 24 hours, Plaintiff and Class members incur a $2 charge each and every time they complete a shift, including when they work multiple shifts within a single day.

41. Second, Defendant's payroll practices require Plaintiff and the Class to incur fees to access their wages.

42. For example, in order to transfer their wages from their Money Network payroll cards to their respective personal bank accounts, Class members are required to pay a two-dollar service fee per transaction.[13] Money Network also imposes on Class members who withdraw their wages via an ATM or at a physical bank fees ranging from $1.50 to $5.00. However, Illinois law requires employers to provide employees "at least one method of withdrawing the employee's full net wages from the payroll card once per pay period, but not less than twice per month, at no cost to the employee, at a location readily available to the employee;" 820 ILCS 115/14.5(3)(A).

---

[13] *List of all fees (Long Form) for the Money Network MyMoneyNetwork Program*, MONEY NETWORK, https://docs.moneynetwork.com/moneynetwork/gpr/41633/en/FINAL_FEE_MNGPR_D1P_112514_EN.pdf (last visited June 15, 2023).

D. **Plaintiff Sonia Perez's Experience**

43. Plaintiff Perez is a Registered Nurse who began working for Defendant in or around 2018. Plaintiff Perez ceased working for Defendant on May 15, 2021.

44. In the course of her employment with Defendant, Plaintiff Perez typically was staffed at nursing homes and other long-term care facilities. Plaintiff estimates that she worked at least nine hundred (900) shifts for Defendant during her employment term.

45. To apply for employment with Defendant and later obtain staffing assignments and manage her employment information, Plaintiff Perez created an account through the Gale App.

46. Like her fellow Class members, Defendant paid Plaintiff Perez on a per-shift basis by depositing a given shift's wages to her Money Network payroll card within twenty-four hours of Plaintiff Perez completing the shift.

47. When Plaintiff Perez began her employment with Defendant, Defendant enrolled Plaintiff Perez in its payroll card program, created a Money Network account on her behalf, and issued her a Money Network payroll card.

48. Plaintiff Perez was required, as a condition of employment with Defendant, to receive her wages through the Money Network payroll card. Defendant also informed her that alternative payroll options were not available.

49. Plaintiff Perez never received a written notice from Defendant disclosing that payment by payroll card is voluntary.

50. Despite being required to enroll in Defendant's payroll card program, Plaintiff Perez never received written notice disclosing the terms of the Money Network payroll card, including an itemized list of all fees associated with the use of the payroll card by Defendant and Money Network.

9

51. Plaintiff Perez likewise was never informed how she could withdraw her own net wages without cost to her, check her account balance, or request to receive paper or electronic transaction histories.

52. Throughout her employment term, Defendant compensated Plaintiff Perez exclusively through the Money Network payroll card issued to her and did not offer alternative payroll methods.

53. Each time Defendant loaded her wages onto Plaintiff Perez's Money Network payroll card, Defendant deducted $2 from her wages.

54. Defendant's agents explained to Plaintiff Perez that Defendant imposed the $2 deduction in connection with the loading of wages onto her Money Network Payroll card.

55. Plaintiff Perez estimates that she worked more than 900 shifts during her employment term, and thus incurred more than $1,800 in unlawful loading fees.

56. In order to withdraw her wages from her Money Network payroll card, Plaintiff Perez regularly paid exorbitant ATM fees. Although Plaintiff Perez found Money Network's ATM fees excessive, she had no choice but to pay them in order to access her wages because Money Network also imposed fees for bank transfers and transferred funds often were delayed in arriving to her account, further impeding her ability to timely access her wages. .

## CLASS ACTION ALLEGATIONS

57. Plaintiff Perez brings this action pursuant to the provisions of Rules 23(a), 23(b)(2), and 23(b)(3) of the Federal Rules of Civil Procedure, on behalf of themselves and the following proposed classes:

> All persons employed by Defendant Gale Healthcare Solutions, LLC in the state of Illinois at any time from 10 years prior to commencement of this action through the present.

58. Excluded from the Class are Defendant, its employees, officers, directors, legal

representatives, heirs, successors, wholly- or partly-owned, and its subsidiaries and affiliates; proposed Class counsel and their employees; the judicial officers and associated court staff assigned to this case and their immediate family members; all persons who make a timely election to be excluded from the Class; governmental entities; and the judge to whom this case is assigned and his/her immediate family.

59. This action has been brought and may be properly maintained on behalf of the Class proposed herein under Federal Rule of Civil Procedure 23.

60. <u>Numerosity</u>. Federal Rule of Civil Procedure 23(a)(1): The members of the Class are so numerous and geographically dispersed that individual joinder of all Class members is impracticable. Class members may be identified during the pendency of this action and all owners and lessors notified by recognized, Court-approved notice dissemination methods, which may include U.S. Mail, electronic mail, Internet postings, and/or published notice. The Class members may be easily identified from Defendant's records.

61. <u>Commonality and Predominance</u>. Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3): This action involves common questions of law and fact, which predominate over any questions affecting individual Class members, including, without limitation:

   a. Whether Defendant engaged in the conduct alleged herein;

   b. Whether Defendant failed to provide the disclosures required by the IWPCA;

   c. Whether Defendant imposed on Plaintiff and the Class fees in connection with its payroll card program prohibited by the IWPCA;

   d. Whether Plaintiff and the other Class members are entitled to equitable relief, including, but not limited to, restitution or injunctive relief; and

   e. Whether Plaintiff and the other Class members are entitled to damages and other

monetary relief and, if so, in what amount.

62. <u>Typicality</u>. Federal Rule of Civil Procedure 23(a)(3): Plaintiff's claims are typical of the other Class members' claims because, among other things, all Class members were similarly injured through Defendant's wrongful conduct as described above.

63. <u>Adequacy</u>. Federal Rule of Civil Procedure 23(a)(4): Plaintiff is an adequate Class representative because her interests do not conflict with the interests of the other members of the Class she seeks to represent; Plaintiff has retained counsel competent and experienced in complex class action litigation; and Plaintiff intends to prosecute this action vigorously. The interests of the Class will be fairly and adequately protected by Plaintiff and her counsel.

64. <u>Declaratory and Injunctive Relief</u>. Federal Rule of Civil Procedure 23(b)(2): Defendant has acted or refused to act on grounds generally applicable to Plaintiff and the other members of the Class, thereby making appropriate final injunctive relief and declaratory relief with respect to the Class as a whole.

65. <u>Superiority</u>. Federal Rule of Civil Procedure 23(b)(3): A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other financial detriment suffered by Plaintiff and the other Class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendant, so it would be impracticable for the members of the Class to individually seek redress for Defendant's wrongful conduct. Even if Class members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments, and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties, and provides the

benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## COUNT I
### Violation of the Illinois Wage Payment and Collection Act
### (By Plaintiff on Behalf of the Class)

66. Plaintiff re-states paragraphs 1-65 as if copied and pasted here.

67. As alleged in paragraphs 1-65 above, Defendant has violated Sections 14.5(1)(2)(3) and (4) of the Illinois Wage Payment and Collection Act.

68. Because of Defendant's violations of the Illinois Wage Payment and Collection Act, Plaintiff (and others similarly situated) have been harmed.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, individually, and on behalf of all members of the Class, respectfully requests that the Court enter judgment in her favor and against Defendant, as follows:

A. Determine that the claim alleged herein may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and issue an order certifying the Class as defined above;

B. Appoint Plaintiff as the representative of the Class and her counsel as Class Counsel;

C. Award all damages to which Plaintiff and the Class are entitled, including but not limited to 1) the amount of underpayments (including all loading fees, transfer fees, and ATM/withdrawal fees); and 2) 5% of the amount of the underpayments for each month following the date of payment during which the underpayments remain unpaid;

D. Award pre-judgment and post-judgment interest on such monetary relief;

E. Grant appropriate injunctive and/or declaratory relief;

F. Award reasonable attorneys' fees and costs; and

G. Grant such further relief that this Court deems appropriate.

## JURY DEMAND

Plaintiff demands trial by jury, pursuant to Federal Rule of Civil Procedure 38.

Date: June 16, 2023

Respectfully Submitted,

/s/ Julie O. Herrera
Steven Molitor
**Law Office of Julie O. Herrera**
159 N. Sangamon Street, Suite 200
Chicago, Illinois 60607
Telephone: (312) 479-3014
Facsimile: (708) 843-5802
jherrera@julieherreralaw.com
smolitor@julieherreralaw.com

Daniel O. Herrera
Paige L. Smith
**CAFFERTY CLOBES MERIWETHER & SPRENGEL LLP**
135 S. LaSalle Street, Suite 3210
Chicago, Illinois 60603
Telephone: (312) 782-4880
Facsimile: (312) 782-4485
dherrera@caffertyclobes.com
psmith@caffertyclobes.com

Gary M. Klinger
**Milberg Coleman Bryson Phillips Grossman, PLLC**
227 W. Monroe Street, Suite 2100
Chicago, Illinois 60606
Telephone: (866) 252-0878
gklinger@milberg.com

Alexander E. Wolf (*pro hac vice forthcoming*)
**Milberg Coleman Bryson Phillips Grossman, PLLC**
280 South Beverly Drive, Penthouse
Beverly Hills, California 90212

Telephone: (872) 365-7060
awolf@milberg.com

*Attorneys for Plaintiff and the Proposed Class*